## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------------x
YOLANDA ACKER,                      :
                                    :
            Plaintiff,              :
                                    :
v.                                  :   Civil No. 13CV1717 (AWT)
                                    :
STEPHEN KING,                       :
                                    :
            Defendant.              :
------------------------------------x
```

## RULING ON MOTION TO DISMISS

The pro se plaintiff, Yolanda Acker ("Acker"), brings this action against Stephen King ("King") for copyright infringement and for perjury.  The defendant has moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For reasons set forth below, the defendant's motion to dismiss is being granted.

## I.   FACTUAL ALLEGATIONS

"The [amended] complaint, which [the court] must accept as true for purposes of testing its sufficiency, alleges the following circumstances." Monsky v. Moraghan, 127 F.3d 243, 244 (2d Cir. 1997).

The plaintiff is the author of an unpublished anthology titled Short Tales of Killing Horror, which includes five short

stories and one of which is titled "The Haunting of Addie Longwood" ("Haunting").  The effective date of the plaintiff's copyright registration for her anthology is May 2, 2011. Haunting "depicts a 12 year old girl named [Jessica] who moves to a town called Ellsworth which is in Maine[.]"  (Am. Compl., Doc. No. 27, at 3.)  Jessica "saves the town from murders" and "has had psychic abilities since her childhood." (Id.)

The plaintiff alleges that she mailed a copy of her Haunting manuscript to the defendant in or around the middle of March 2012.  The defendant's assistant responded with a letter dated April 24, 2012.  The letter acknowledged receipt of the manuscript, and also stated that "[t]he demands on [King's] time also make it impossible to read and comment on unsolicited manuscripts."  (Am. Compl., Ex. 3, Doc. No. 27-3, at 2.)  In or around May 2012, the plaintiff searched online for the defendant's name and upcoming novels and learned about the upcoming publication of the defendant's novel Doctor Sleep.  The plaintiff alleges the theme of the defendant's novel to be:

> [T]he main character besides the boy Dan Torrance to be a 12 year old girl named Abra Stone who had moved to a new town (New Hampshire) and coincidentally met this/Dan Torrance boy whom they both have psychic abilities and at the end save the town from paranormal murders.

(Am. Compl., Doc. No. 27, at 3.)  The plaintiff alleges the defendant "willfully stole [her] main character to finish off

2

his story 'Dr. Sleep' he addresses [her] character but
coincidentally changes the way it was written offhandedly . . .
." (Id. at 6.)  With respect to the perjury claim, the
plaintiff alleges that the defendant made false statements
"about [her] as to not know who [she is]."  (Id.)

## II.  LEGAL STANDARD

When deciding a motion to dismiss under Rule 12(b)(6), the
court must accept as true all factual allegations in the
complaint and must draw inferences in a light most favorable to
the plaintiff.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).
Although a complaint "does not need detailed factual
allegations, a plaintiff's obligation to provide the 'grounds'
of his 'entitle[ment] to relief' requires more than labels and
conclusions, and a formulaic recitation of the elements of a
cause of action will not do."  Bell Atlantic Corp. v. Twombly,
550 U.S. 550, 555 (2007) (citing Papasan v. Allain, 478 U.S.
265, 286 (1986) (on a motion to dismiss, courts "are not bound
to accept as true a legal conclusion couched as a factual
allegation")).  "Nor does a complaint suffice if it tenders
naked assertions devoid of further factual enhancement."
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly,
550 U.S. at 557).  "Factual allegations must be enough to raise
a right to relief above the speculative level, on the assumption
that all allegations in the complaint are true (even if doubtful

3

in fact)." <u>Twombly</u>, 550 U.S. at 555 (citations omitted).
However, the plaintiff must plead "only enough facts to state a
claim to relief that is plausible on its face." <u>Id</u>. at 570.
"The function of a motion to dismiss is 'merely to assess the
legal feasibility of the complaint, not to assay the weight of
the evidence which might be offered in support thereof.'"
<u>Mytych v. May Dept. Store Co.</u>, 34 F. Supp. 2d 130, 131 (D. Conn.
1999) (quoting <u>Ryder Energy Distribution v. Merrill Lynch
Commodities, Inc.</u>, 748 F.2d 774, 779 (2d Cir. 1984)). "The
issue on a motion to dismiss is not whether the plaintiff will
prevail, but whether the plaintiff is entitled to offer evidence
to support his claims." <u>United States v. Yale New Haven Hosp.</u>,
727 F. Supp. 784, 786 (D. Conn. 1990) (citing <u>Scheuer</u>, 416 U.S.
at 232).

    In its review of a motion to dismiss for failure to state a
claim, the court may consider "only the facts alleged in the
pleadings, documents attached as exhibits or incorporated by
reference in the pleadings and matters of which judicial notice
may be taken." <u>Samuels v. Air Transport Local 504</u>, 992 F.2d 12,
15 (2d Cir. 1993).

    When considering the sufficiency of the allegations in a
<u>pro se</u> complaint, the court applies "less stringent standards
than [those applied to] formal pleadings drafted by lawyers."
<u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972); <u>see</u> <u>also</u> <u>Branham v.</u>

4

Meachum, 77 F.3d 626, 628-29 (2d Cir. 1996).  Furthermore, the court should interpret the plaintiff's complaint "to raise the strongest arguments [it] suggest[s]."  Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).

### III. DISCUSSION

#### A.   Copyright Infringement

"[A] principle fundamental to copyright law [is that] a copyright does not protect an idea, but only the expression of an idea."  Kregos v. Associated Press, 3 F.3d 656, 663 (2d Cir. 1993) (citing Baker v. Selden, 101 U.S. 99, 103 (1879)).  Thus, "the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization."  Reyher v. Children's Television Workshop, 533 F.2d 87, 91 (2d Cir. 1976). "In order to establish a claim of copyright infringement, a plaintiff must show ownership of a valid copyright and the defendant's infringement by unauthorized copying."  Laureyssens v. Idea Group, Inc., 964 F.2d 131, 139 (2d Cir. 1992). Copyright registration is "prima facie evidence of the valid ownership of copyright . . . ."  Rogers v. Koons, 960 F.2d 301, 306 (2d Cir. 1992).  The plaintiff's satisfaction of the first element of a prima facie case of copyright infringement is not disputed here.

5

"To satisfy the second element of an infringement claim – the 'unauthorized copying' element – a plaintiff must show both that [her] work was 'actually copied' and that the portion copied amounts to an 'improper or unlawful appropriation.'" Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003) (quoting Castle Rock Entm't v. Carol Publ'g Grp., Inc., 150 F.3d 132, 137 (2d Cir. 1998)).  "Actual copying may be established either by direct evidence of copying or by indirect evidence, including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony." Castle Rock, 150 F.3d at 137 (internal quotation marks and citation omitted).  The plaintiff has not alleged any direct evidence of copying.  As for indirect evidence, for the purpose of the motion to dismiss only, the defendant has assumed arguendo that the plaintiff's "allegation that she sent an unsolicited copy of her manuscript of Haunting to King is sufficient to establish access, and that there are sufficient similarities in Doctor Sleep to be probative of copying[.]" (Def.'s Mem., Doc. No. 34, at 11.)

"It is only after actual copying is established that one claiming infringement then proceeds to demonstrate that the copying was improper or unlawful by showing that the second work bears substantial similarity to protected expression in the earlier work."  Castle Rock, 150 F.3d at 137 (internal quotation

marks and citations omitted).  "[A] determination of substantial similarity requires a detailed examination of the works themselves," Williams v. Crichton, 84 F.3d 581, 583 (2d Cir. 1996) (internal quotation marks and citation omitted), and asking "whether a lay observer would consider the works as a whole substantially similar to one another."  Id., at 590.  The Second Circuit has noted that "[w]hen we determine that a work contains both protectible and unprotectible elements, we must take care to inquire only whether the protectible elements, standing alone, are substantially similar."  Id., at 588 (quoting Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1002 (2d Cir. 1995)) (internal quotation marks omitted and emphasis in original).  "[S]cenes a faire, that is, scenes that necessarily result from the choice of a setting or situation" are unprotectible.  Walker v. Time Life Films, Inc., 784 F.2d 44, 50 (2d Cir. 1986).  Examples of scenes a faire are "[e]lements such as drunks, prostitutes, vermin and derelict cars [that] would appear in any realistic work about the work of policemen in the South Bronx."  Id.  "Neither does copyright protection extend to copyright o[f] 'stock' themes commonly linked to a particular genre.  Foot chases and morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often-recurring themes of police fiction."  Id.  In addition, "[c]opyright law provides very

limited protection to the characters presented in the creative work. Basic character types are not copyrightable." Jones v. CBS, Inc., 733 F. Supp. 748, 753 (S.D.N.Y. 1990) (citing Nicholas v. Universal Pictures Corp., 45 F.2d 119, 121-22 (2d Cir. 1930)). "[T]he less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly." Nicholas, 45 F.2d at 121.

"[B]ecause the question of substantial similarity typically presents an extremely close question of fact, questions of non-infringement have traditionally been reserved for the trier of fact." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 63 (2d Cir. 2010) (internal citation omitted). However, "it is entirely appropriate for a district court to resolve that question as a matter of law, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." Id. (internal quotation marks and citation omitted). "These same principles hold true when a defendant raises the question of substantial similarity at the pleadings stage on a motion to dismiss." Id., at 64. Thus, where, as here, the works upon which the plaintiff has relied in bringing the action are incorporated into the Amended Complaint by reference, "it is entirely appropriate for the district court

to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation." Peter F. Gaito Architecture, 602 F.3d at 64.  If the court determines that the two works are not substantially similar as a matter of law, "the district court can properly conclude that the plaintiff's [amended] complaint, together with the works incorporated therein, do not 'plausibly give rise to an entitlement to relief.'"  Id. (quoting Iqbal, 556 U.S. at 679).

For purposes of making a determination as to substantial similarity, the following are significantly abridged descriptions of the two works based upon the court's reading of Haunting and Doctor Sleep.  See Walker, 784 F.2d at 49 ("Each of the panel members has read the book and viewed the film.").

1. "The Haunting of Addie Longwood"

The plaintiff's 18-page manuscript tells the following story:

> A family moves from California to a town in Maine
> called Ellsworth.  A twelve year old girl named
> Jessica [has been] blessed with a gift of psychic
> abilities since her childhood.  In this new town, a
> girl named Addie Longwood was the most recent victim
> of a trail of gruesome murders.  From a psychopath
> named Robert Reed who kidnaps 12 year old girls and
> tortured deaths.  Jessica meets a girl named Cecilia
> Stillman who was best friends with Addie.  Jessica is
> haunted by the souls of the murders and Addie's past
> and her psychic abilities helps reveal the killer,
> save the town of this gruesome nightmare.

(Am. Compl., Ex. B., Doc. No. 27-2, at 1.)

Haunting begins with a description of Jessica's family, which includes her mother, father, and two brothers.  The story then shifts to Ellsworth and the murder of Addie Longwood.  The story returns to Jessica's family on their moving day from California to Ellsworth.  During the family's drive to Ellsworth, they stop at a gas station, and Jessica catches a man staring at her.  Based on his appearance, Jessica surmises that he probably is a painter.  The story then switches to Addie's parents' points of view to tell about the aftermath of Addie's murder.

On the first night sleeping in her new house after arriving in Ellsworth, Jessica sees Addie's ghost in a mirror looking back at her.  The next morning, the local painter, Robert Reed, stops by the house and introduces himself to Jessica's father, her mother, and Jessica.  Later that day, Jessica meets Cecilia, who had been Addie's best friend, and Cecilia's father.  Cecilia's family lives across the street from Jessica, and they are having a garage sale that day.  Cecilia's father says to Jessica that she reminds him of Addie.  Jessica then has a vision of the man she saw at the gas station.  Neighbors who stop by the garage sale also tell Jessica that she resembles Addie.

Jessica catches Robert Reed looking at her.  Robert Reed exclaims to her that he knows her and that she is Addie Longwood coming to haunt him.  Addie's ghost then appears behind Robert Reed, and Addie's haunting leads Robert Reed to confess all of his murders, including Addie's murder.  Following the confession, the police arrest Robert Reed.  The story then ends: "The worst was over and the town of Ellsworth was now able to rest peacefully."  (Am. Compl., Ex. B., Doc. No. 27-2, at 18.)

   *2.  Doctor Sleep*

In Doctor Sleep, a 528-page novel, King continues the story of Danny Torrance, the 5-year-old protagonist from The Shining. The novel begins with the three survivors from The Shining: Danny, his mother Wendy, and Dick Hallorann, who shares Danny's "shining," i.e., psychic abilities.  Danny struggles to deal with seeing the old ghosts that inhabited the Overlook Hotel in The Shining, and Dick Hallorann returns to teach Danny how to lock the old ghosts in mental boxes and bury them deep in his mind.  The storyline then fast forwards to an all-grown up Danny (now Dan), who has become an alcoholic like his father.  Dan hits rock bottom when, as he is leaving from a one-night stand with an addict, the addict's toddler catches him stealing money from her; Dan knows through his psychic abilities that the toddler is being abused, yet he does nothing.  Later, Dan learns that the toddler and his mother are dead.  This proves to be a

turning point in Dan's life, and it motivates him to join Alcoholics' Anonymous ("AA") and to obtain a job at a hospice. At the hospice in New Hampshire, he uses his "shining" to help residents die peacefully, and he acquires the nickname Doctor Sleep.

The novel also introduces a vampire-like cult group called the True Knot that travels around the country in mobile homes and feeds on "steam," which is extracted when children who "shine" are tortured to death.  "Steam" gives the True Knot members their everlasting youth.  The True Knot is led by Rose O'Hara, or Rose the Hat as she is known within group.  The True Knot storyline opens with the group recruiting a new member, Andi Steiner.  Rose the Hat agrees to recruit Andi into the True Knot because she enjoyed watching Andi hypnotize a business man, rob him, and mutilate him.  The group turns Andi into a True Knot member by forcing her to take "steam."

Another central character in the novel is a girl named Abra Stone who lives in a neighboring town about twenty miles from Dan and who shares the "shining."  Abra, whose "shining" is far stronger than Dan's, first manifested her psychic abilities as an infant when she predicted the 9/11 disaster.  Dan and Abra forge a friendship over the years through telepathic messages.

The three storylines of Dan, the True Knot, and Abra initially proceed separately, but the storylines converge about

a decade into Dan's AA sobriety and when Abra is about ten years old.  Through her psychic abilities, Abra learns of the killing of a boy in Iowa by the True Knot.  However, the psychic connection that allows Abra to witness Rose the Hat killing the boy also allows Rose to become aware of Abra's existence and the fact that Abra possesses a huge amount of "steam."  The True Knot leaves Abra alone for a few years, but when Rose the Hat finds Abra in her head again, she decides that the True Knot will kidnap Abra and keep her because Abra's steam will be enough to feed the True Knot for many years.

Abra reaches out to Dan for his help, and half-way through the novel, Dan and Abra meet for the first time.  The second half of the book focuses on Dan and Abra's fight against the True Knot as each side races to find and locate the other side first.  Pressure to find Abra is added when members of the True Knot begin to get sick and die of measles, and Abra's "steam" is believed to be their cure.

Dan and Abra eventually track down the True Knot to where the Overlook Hotel used to be in Colorado before it burned down. Some of the True Knot members track Abra to New Hampshire and one kidnaps her, while Dan, with the help of some friends, manages to kill a few of the other members.  However, Abra defeats her kidnapper by swapping her consciousness with Dan's, who then taps into Abra's psychic powers and kills the

kidnapper.  At this point in the novel, a plot twist is revealed: Dan and Abra are related, i.e., Dan's father is Abra's grandfather.  It is also revealed that Abra shares some characteristics with her grandfather, including her temper and her habit of rubbing her mouth when she is upset.

In the final battle, Dan and a psychic projection of Abra fight against Rose the Hat at the Bluebell Campground in Colorado where the Overlook Hotel used to be.  In order to defeat Rose the Hat, Dan decides to open two locked boxes containing the ghosts from the Overlook Hotel he had buried deep in his mind.  Together, Dan and Abra defeat Rose the Hat and eliminate the True Knot.  As Dan leaves the Overlook Lodge, he sees his father giving him a flying kiss.

The last two chapters of the novel take place a few years after the final battle.  Dan celebrates his 15-year sobriety anniversary at an AA meeting and shares the story of his one-night stand as a way of coming to terms with his addiction. Abra also celebrates her 15th birthday.  Dan continues to act as a friend and a mentor to Abra, including teaching Abra how to manage her anger.  The novel ends with Dan using his "shining" to help a patient at the hospice die peacefully in his sleep.

    3.   *Analysis re Substantially Similar*

Based upon a comparison of Haunting and Doctor Sleep, the court concludes that no reasonable observer could find them to

14

be substantially similar beyond the level of generalized or otherwise unprotectible ideas.  While the two works do share some similarities, i.e., a basic character type of a girl with psychic abilities, a setting in a New England town, and using psychic abilities to save people, these similarities at most demonstrate that the two works share unprotectible elements.  A supernatural story set in a New England town is an unprotectible idea.  See Williams, 84 F.3d at 589 (finding dinosaur zoo as a story setting to be an unprotectible idea).  Likewise, a young girl with psychic abilities as a protagonist is an unprotectible idea.  See Hogan v. DC Comics, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 2010) (finding a half-vampire character who is on a quest that leads him to discover his origins to be an unprotectible idea).  In addition, using psychic abilities to save people, seeing and doing supernatural things, and defeating villains are scenes a faire that flow necessarily from the idea of a character using her psychic abilities to triumph over evil.

Moreover, the general likeness of the unprotectible elements between Haunting and Doctor Sleep is far outweighed by specific differences in plotlines, structure, themes, details, scenes, events, and characterization.  Haunting is a straightforward story about a young girl, Jessica, with psychic abilities.  Jessica's resemblance to Addie Longwood and presence in Addie's town spur Addie's murderer to confess his crimes.

15

The story appears to span a period of a few weeks, from when Jessica moves from California to Ellsworth to when Robert Reed confesses his murders shortly after Jessica moves into her new home.  The story touches upon themes such as Jessica coping with having supernatural abilities, and Addie's parents' grief over Addie's death.

Doctor Sleep, on the other hand, contains three storylines that eventually converge.  The novel spans decades and explores multiple themes, e.g., Dan's struggle with alcoholism; Dan's fear of becoming like his father; the mentor-mentee relationship between Dan and Abra; Abra's parents' reaction to having a child with supernatural abilities; and Abra's and Dan's shared struggle to prevent their proclivity for anger from destroying relationships in their lives.  The villains in Doctor Sleep, i.e., members of the True Knot, also appear to possess certain redeeming qualities, such as love, loyalty, and a familial bond with one another.  Moreover, Doctor Sleep is a continuation of The Shining, and that point is underscored by the fact that Abra's grandfather was the caretaker of the Overlook Hotel from The Shining, and by the fact that the scene of the final battle with the True Knot is in the Bluebell Campground in Colorado, where the Overlook Hotel used to be.

The court concludes that the similarities between Haunting and Doctor Sleep, i.e., a young girl with psychic abilities who

16

uses her abilities to save people in a New England town, are all
unprotectible ideas.  Even if they are protectible, it is
apparent that the defendant's particular expression of these
ideas in Doctor Sleep is not at all similar, much less
substantially similar, to the plaintiff's expression of them in
Haunting.  Therefore, the plaintiff's Amended Complaint,
together with the works incorporated therein, do not plausibly
give rise to an entitlement to relief, so the motion to dismiss
the plaintiff's copyright infringement claim is being granted.

**B.   Perjury**

Perjury is a criminal offense involving the willful act of
swearing a false oath or of falsifying an affirmation to tell
the truth.  See 18 U.S.C. § 1621; Conn. Gen. Stat. § 53a-156
(perjury as a Class D felony); Conn. Gen. Stat. § 53a-157b
(perjury as a Class A misdemeanor).  In Connecticut, there is no
civil remedy or cause of action for perjury.  See DeLaurentis v.
New Haven, 220 Conn. 225, 264 (1991) ("While no civil remedies
can guard against lies, the oath and the fear of being charged
with perjury are adequate to warrant an absolute privilege for a
witness' statements.").  For the benefit of the pro se
plaintiff, the court notes that even if a civil cause of action
for perjury did exist, the plaintiff's allegation that the
defendant committed perjury because the plaintiff received a
letter from the defendant's assistant acknowledging receipt of

her manuscript would be insufficient to state a claim to relief that is plausible on its face.  Therefore, the motion to dismiss the plaintiff's perjury claim is being granted.

**IV.  CONCLUSION**

For the forgoing reasons, the defendant's Motion to Dismiss Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), or in the Alternative, for Summary Judgment Pursuant to Fed. R. Civ. P. 56 (Doc. No. 32) is hereby GRANTED, and the Amended Complaint is dismissed.

The Clerk shall close this case.

It is so ordered.

Signed this 24th day of September 2014 at Hartford, Connecticut.

/s/
_____
Alvin W. Thompson
United States District Judge
